UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------X

CYNTHIA FELIX,                                     **1:21-cv-06109-LGS**

                              *Plaintiff,*

                                                   **AMENDED COMPLAINT**

          -against-

                                                   **PLAINTIFF DEMANDS**
THE NEW YORK CITY DEPARTMENT OF EDUCATION,          **A JURY TRIAL**

                              *Defendant.*
------------------------------------------------------------------------X


Plaintiff Cynthia Felix, as and for her Amended Complaint, respectfully alleges, all upon information and belief, as follows:


## JURISDICTION AND VENUE

1.      This Court has original jurisdiction over the subject matter of this litigation pursuant to 28 U.S.C §1331, in that certain of the Plaintiff's claim arise under the laws of the United States, namely Title I of the Americas with Disabilities Act of 1990.

2.      Venue is proper under 42 U.S.C §2000e-5(f)(3) and 28 U.S.C §1391(b) because the Defendant resides in and does business within the Southern District of New York and Plaintiff performed her work within this District.

3.      Plaintiff filed a charge of unlawful discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission on December 11, 2020 and received a Notice of Right to Sue on July 13, 2021.

## IDENTITY OF PARTIES

4.      At all relevant times mentioned herein, Plaintiff Cynthia Felix ("Felix") has been employed by Defendant the New York City Department of Education ("the DOE") for nearly thirty years, starting in 1991.

5.      At all relevant times mentioned herein, the DOE was and is a New York City governmental agency responsible for the administration of New York City's public-school system, which is located in the City and State of New York.

## BACKGROUND RELEVANT TO BOTH CAUSES OF ACTION

*6.*      Felix commenced her employment with the DOE in 1991 as a classroom teacher in monolingual, bilingual students with disabilities and ELL settings from nursery school through 6th Grade.

7.      Over the next three decades, Felix performed very well for the DOE, rising in rank from Teacher, to Director, to Assistant Superintendent/Network Leader.

8.      In July 2017, Felix began working as Senior Director of Bilingual Programs, Division of Multilingual Learners ("DML").

9.      Felix suffers from several disabling medical conditions, including chronic obstructive pulmonary disease ("COPD"), asthma, pulmonary fibrosis and hypertension, atrial tachycardia and flutter, atrial septal defect and arrhythmia.

10.     Despite her various medical conditions, Felix has successfully fulfilled her job responsibilities, as confirmed by the positive feedback, promotions and significant career advancement she has received.

11.     In her role as Senior Director of Bilingual Programs in the DML, Felix worked with the DML team to oversee transitional bilingual and dual language programming, including the compliance of current programs, the development of new programs, the phase out of programs, as well as working with other Central Divisions to analyze data to determine programmatic needs in communities and strategizing with community leaders and stakeholders to establish new bilingual programs that meet the needs of all students as well as supporting existing needs.

12.     On July 24, 2019, Alicia Dorsey ("Dorsey"), Chief Operating Officer, Office of the Chief Academic Officer, advised Felix that Felix would be moved from her position at headquarters located at 52 Chambers Street (a/k/a "Tweed") to Long Island City.

13.     Felix, who resides in Brooklyn and has a history of fainting due to some of her medical conditions, advised Dorsey that she could not medically tolerate such a long commute and reasonably requested an accommodation to an office in Brooklyn.

14.     Dorsey, without engaging in any interactive process, refused to discuss Felix's request and flatly denied it, stating Felix that had to report to Long Island City the next day.

15.     The majority of Felix's team members were located in Manhattan, not Long Island City.

16.     Felix expressed that this was physically and medically impossible for her and further advised Dorsey that she would file a written request for an accommodation through the DOE Office of Equal Opportunity ("OEO") and her Union Council of School Supervisors and Administrators ("CSA").

17.     Felix observed Dorsey become angry because of her effort to protect herself from a directive that would place her in harm's way by jeopardizing her health and safety.

18.    Shortly after the meeting between Dorsey and Felix ended, Felix was advised that Dorsey advised representatives at the Department of Citywide Administrative Services ("DCAS"), the agency that provides security services at Tweed that Felix had been terminated and that she no longer had authorization to enter headquarters.

19.    In furtherance of her false statements to DCAS, Dorsey had a photograph of Felix placed at the entrance to Tweed to aid in ensuring that she would not be granted admittance to that facility.

20.    There was no legitimate reason for the DOE to deny Felix access to headquarters, confirming that it was done to swiftly and brutally punish Felix and retaliate against her for telling Dorsey that she would complain about Dorsey's discriminatory refusal to accommodate her disability.

21.    As soon as Felix learned about her photograph being placed at the entrance to Tweed, she attempted to have it removed by, among other things, contacting her Union, and Felix was led to believe that the photograph was removed.

22.    On July 25, 2019, the next day, Felix contacted the DOE's medical accommodation unit and requested, as a reasonable accommodation, that she be transferred to an office in Brooklyn North rather than Long Island City.

23.    Felix was fully capable of performing her duties at Brooklyn North and going to that location would not risk her health.

24.    On that same day, Felix made the same request to Dorsey.

25.    Five days later, on July 30, 2019, Linda Chen ("Chen"), the Chief Academic Officer, accused Felix of "unprofessional conduct," which was a baseless accusation on her

otherwise unblemished record and was incredibly distressing to Felix, as it would be to any reasonable employee.

26.     Revealingly, Chen's allegations were based on something that allegedly happened 6 weeks earlier, on June 19, 2019, confirming that the real reason for this allegation was to punish Felix for her persistent complaints about not being given a reasonable accommodation.

27.     On August 2, 2019, Felix's request for a reasonable accommodation was denied, without any interactive process or reason provided.

28.     Felix then filed another request for a reasonable accommodation through the DOE's HR Connect and also OEO and was ultimately advised that there was an office at 65 Court Street, Room 411A, in Brooklyn where she could be placed.

29.     Felix feared further retaliation and requested that she be transferred to a different department but pending the resolution of her request, Felix reported to the office in Brooklyn on August 26, 2019.

30.     It immediately became clear to Felix that her transfer to the Brooklyn office was not a reasonable accommodation of her medical condition.

31.     Felix was distressed to find a windowless office with no ventilation, which exacerbated Felix's medical condition, and she was required to visit urgent care that day, confirming that the DOE did not accommodate Felix's medical condition.

32.     Additionally, the Brooklyn office did not have WiFi, which Felix required.

33.     The following day, August 27, 2019, Felix contacted Virginia Walton-Smalls ("Smalls") of OEO and Darien Glenn of HR Connect and requested a different office.

34.     Smalls advised Felix that she would contact Felix's supervisors.

35.     Felix's request to move to an office with better ventilation and a dedicated WiFi connection was denied and Smalls advised Felix that an additional air purifier would be provided, though that was not a substitute for proper ventilation and did not accommodate Felix's medical condition.

36.     Smalls also told Felix that she could take breaks to use WiFi in other areas, though this did not resolve the issue of Felix's cardiac monitor and the need for a dedicated connection.

37.     Felix continued to complain to Smalls and HR Connect about the office and the impact of the poor ventilation on her medical condition and again requested to move to a suitable office.

38.     On August 30, 2019, Chen sent Felix a letter that reconfirmed the baseless allegations of "misconduct" that she had made during their meeting of July 30, 2019, which was intended to and did further intimidate and threaten Felix.

39.     On September 6, 2019, Felix followed up with Smalls once again and advised her that the additional air purifier that she promised to send had not been received.

40.     On September 10, 2019, Felix was advised by HR Connect that her request to move offices was denied.

41.     When Felix asked Glenn Darrien Medical Unit HR Connect to explain the reason for the denial, despite the fact that her medical condition had been confirmed, he sheepishly confirmed that Felix must be working in a "hostile environment."

42.     On that same day, Felix again followed up with Smalls and again asked for another space, as she had several medical episodes and had not yet received the promised additional air purifier.

43.     On September 11, 2019, Smalls advised Felix that there would be no additional air purifier, that the office already had an air purifier and that she had been accommodated as much as the DOE could do so at that point, which was an outrageous claim since no accommodation had been provided whatsoever.

44.     On September 17, 2019, Dorsey visited Felix in her office concerning certain paperwork and, at that time, Felix advised Dorsey that she intended to go to Tweed the next day to file FMLA papers.

45.     On September 18, 2019, Felix notified her office and Dorsey that she was leaving for Tweed at 12:30pm.

46.     However, when Felix arrived at Tweed, Felix was denied access and the DCAS security officers advised Felix that they had been told by Dorsey that Felix was terminated.

47.     Felix also observed that a sign with her photograph stating that she was to be denied entry, which she had been led to believe was removed, was still on display, which was outrageous and incredibly distressing to Felix.

48.     Felix was mortified and humiliated in front of her colleagues, some of whom were in the area when Felix was being removed from Tweed.

49.     The photograph of Felix was permitted to remain posted at Tweed for *approximately four months* before finally being removed.

50.    After the public embarrassment of September 18, 2019, Felix continued to press for a transfer away from the supervisors that were retaliating against her for requesting to be accommodated with a different office, but her requests were ignored.

51.    Felix continued to be reviewed negatively since she had requested an accommodation, as confirmed by a false accusation that Ilene Altschul made in October 2019 that Felix had misrepresented herself at a conference as representing the DOE when she was not.

52.    This accusation, like the prior accusations of "unprofessional conduct," was completely false, but confirmed to Felix that she was being punished because she requested an accommodation.

53.    In November 2019, Felix met with Altschul, who requested that Felix resubmit all her timesheets for the period August – October 2019 and include additional information that had never before been requested and which her colleagues were not required to do, further confirming that she was being punished because she requested an accommodation.

54.    In December 2019, Felix learned that other DOE employees had become ill when they had occupied the unventilated, windowless office to which she had been assigned, meaning that the DOE knowingly put Felix in a location that was dangerous to her health while doing so under the guise of accommodating her medical condition.

55.    Felix filed a complaint with OSHA about the dangerous condition of her office.

56.    Felix also sought the assistance Disability Rights of New York, the Protection & Advocacy System and Client Assistance Program ("P&A/CAP") for persons with disabilities in New York State.

57.     P&A/CAP attempted to intervene with the DOE on Felix's behalf with regard to her request to be moved to an appropriate office and one that would not exacerbate her medical condition and cause her harm.

58.     Despite its efforts, P&A/CAP was unsuccessful in securing a reasonable accommodation for Felix, who also continued to fear further retaliation from her supervisors.

59.     In January 2020, Felix received a write-up from Altschul for failing to provide her with adequate notice for a vacation day taken three months prior on October 21, 2019.

60.     Revealingly, Altschul signed the October timesheet and annual vacation form submitted by Felix approving the October 21, 2019 vacation day, confirming that the real reason for this allegation was to punish Felix for her persistent complaints about not being given a reasonable accommodation.

61.     In early February 2020, a representative from the United Federation of Teachers came to Felix's office and performed a test of the air quality in the office, which confirmed mold and mildew in the vents.

62.     In March 2020, the COVID-19 pandemic caused closures of offices in New York City and around the world and, at that time, Felix and her colleagues began working remotely.

63.     Felix continued to work remotely until in or about July 2021, when DOE employees were recalled back to the office based on a schedule that would ramp up over the following months.

64.     Accordingly, Felix returned to in-person work on July 12, 2021 to the same dirty office with no ventilation, because the DOE refused to provide her with a reasonable accommodation or to even engage in an interactive process with her.

65.      Since that date, Felix has made every effort to transfer to a different office to no

avail and has continued to seek a reasonable accommodation pursuant to the DOE's procedures.

**FELIX'S TIMELY FILING WITH THE EEOC AFTER THE DOE**
**REFUSED HER REQUEST FOR A REASONABLE ACCOMMODATION**

66.      Felix first filed an inquiry with the EEOC on September 10, 2019, which was the

same day she was told that the DOE had denied her request for a medical accommodation.

67.      Felix did not have counsel at that time.

68.      Felix was thereafter in contact with an EEOC Investigator and was interviewed on

December 5, 2019.

69.      On December 8, 2019, at the request of Plaintiff, the Investigator sent Felix a draft

charge of disability discrimination under the Americans with Disabilities Act for her review and

approval.

70.      Felix signed the charge and emailed it back to the Investigator the following day,

December 9, 2019, reasonably expecting that it would be processed by the EEOC according to its

policies and procedures.

71.      Soon after filing the charge, Felix emailed the Investigator to check on the status of

her filed charge and received an email directing all messages to the Investigator's supervisor, and

Felix subsequently learned that the Investigator had left the EEOC.

72.      Felix repeatedly followed up with the supervisor but the supervisor did not respond

to Felix.

73.    In early February 2020, Felix called the EEOC's 800 phone number and was told to re-file her inquiry, which she did on February 4, 2020.

74.    On February 26, 2020, Felix received an email scheduling another interview for March 4, 2020.

75.    This interview was rescheduled a number of times at the request of the EEOC because of the COVID-19 pandemic.

76.    Ultimately, on July 24, 2020, Felix was interviewed a second time about the same facts.

77.    On that same day, the EEOC prepared another draft charge and assigned Felix a new charge number.

78.    Felix had a proposed change to the charge and so advised the EEOC soon thereafter, but did not hear back.

79.    On or about August 18, 2020, Felix checked the EEOC portal and saw that her case was marked "closed," which was a complete shock to her.

80.    Felix immediately contacted the EEOC, both by email and the 800 telephone number, to inquire why her case had been marked "closed."

81.    Felix was advised to resubmit an inquiry to the EEOC, which she did on August 18, 2020, and received a third charge number.

82.    On September 9, 2020, Felix received an email scheduling a third interview for December 1, 2020.

83.    On December 1, 2020, Felix was interviewed for a third time, during which time Felix inquired about the first charge she had filed on December 9, 2019 and also in February 2020.

84.    The Investigator told Felix that the two prior Investigators had not properly processed her charge.

85.    The following day, December 2, 2020, Felix received an email from the Investigator advising her that if she finalized a new charge by December 16, 2020, her claim would be timely.

86.    Specifically, the Investigator wrote, "I also want reiterate that the charge needs to be finalized by December 16, 2020, in order for this to be timely."

87.    Relying on the EEOC's representation, Felix re-filed her charge based on the same facts and circumstances on December 11, 2020, even though the filing on that date put the DOE's denial of her accommodation outside of the prior 300 day period.

## AS AND FOR A FIRST CAUSE OF ACTION ON BEHALF OF FELIX AGAINST THE DOE FOR DISABILITY DISCRIMINATION IN VIOLATION OF THE ADA

88.    Felix repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 87 of this Complaint, as though fully set forth at length herein.

89.    At all relevant times, the DOE was subject to the Americans with Disabilities Act.

90.    Up to the time of the wrongful, unlawful, and discriminatory actions alleged herein, which was an adverse employment action, Felix was fully qualified for her position.

91.    At all relevant times, Felix was disabled within the meaning of the Americans with Disabilities Act because she has a record of and/or was regarded by the DOE as having a physical or mental impairment that substantially limits one or more major life activities, due to her diagnoses of COPD, asthma, pulmonary fibrosis and hypertension, atrial tachycardia and flutter, atrial septal defect and arrhythmia.

92.     Felix was otherwise qualified to perform the essential functions of job with a reasonable accommodation.

93.     Felix suffered adverse employment action because of her disability, which included refusing to engage in the interactive process, denigrating and humiliating Felix by stating she was terminated when she was not, demeaning Felix by posting her photograph at headquarters with a statement that was she was denied access and wrongfully accusing Felix of unprofessional conduct.

94.     The hostile, offensive, demeaning and intimidating work environment created by the DOE, as described herein, was unwelcome to Felix, as it would reasonably be to any person, and severely or pervasively altered the terms, conditions and privileges of her employment.

95.     As a proximate result of the DOE's conduct, Felix has been adversely affected in her employment and in her normal life's pursuits, was caused to suffer injuries resulting in emotional anguish and suffering and has been humiliated and demeaned because of the DOE's discriminatory conduct in violation of Felix's human rights, all of which impacted upon her well-being and the quality of her life.

96.     The facts contained herein constitute unlawful discrimination against Felix by the DOE based on Felix's disability, in violation of - I of the Americans with Disabilities Act ("the ADA"), 42 U.S.C. §12112(a), which, *inter alia*, states that:

> No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions and privileges of employment.

97.     As a direct and proximate result of the DOE's violation of the ADA, the DOE is liable to Felix for compensatory damages, costs, interest and reasonable attorney's fees.

98.     Felix, therefore, seeks compensatory damages in this First Cause of Action, including, among other things, for the emotional harm inflicted upon her, in an award to be determined at a trial of this matter, as well as, reasonable attorney's fees, the costs of this action and prejudgment interest.

### AS AND FOR A SECOND CAUSE OF ACTION ON BEHALF OF FELIX AGAINST THE DOE FOR FAILURE TO GRANT A REASONABLE ACCOMMODATION IN VIOLATION OF THE ADA

99.     Felix repeats, re-alleges and incorporates each and every allegation contained in paragraphs 1 through 98 of this Complaint, as though fully set forth at length herein.

100.    At all relevant times, Felix was a person with a disability under the meaning of the Americans with Disabilities Act because she has a record of and/or was regarded by the DOE as having a physical or mental impairment that substantially limits one or more major life activities, due to her diagnoses of COPD, asthma, pulmonary fibrosis and hypertension, atrial tachycardia and flutter, atrial septal defect and arrhythmia.

101.    At all relevant times, the DOE was covered by the ADA and had notice of Felix's disability.

102.    With a reasonable accommodation, Felix could perform the essential function of her job, yet the DOE refused to make such an accommodation for her.

103.    The DOE's refusal to provide Felix with a reasonable accommodation based on her disability was in violation of the ADA, 42 U.S.C. §12112(b)(5)(a), which, *inter alia*, states that:

> [T]he term "discriminate against a qualified individual on the basis of disability" includes . . . not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee, unless such covered entity can demonstrate that the accommodation would impose an undue hardship on the operation of the business of such covered entity.

104.    As a proximate result of the DOE's conduct, Felix has been adversely affected in her employment and in her normal life's pursuits, was caused to suffer injuries resulting in emotional anguish and suffering and has been humiliated and demeaned because of the DOE's discriminatory conduct in violation of Felix's human rights, all of which impacted upon her well-being and the quality of her life.

105.    As a direct and proximate result of the DOE's violation of the ADA, the DOE is liable to Felix for compensatory damages, costs, interest and reasonable attorney's fees.

106.    Felix, therefore, seeks compensatory damages in this First Cause of Action, including, among other things, for the emotional harm inflicted upon her, in an award to be determined at a trial of this matter, as well as, reasonable attorney's fees, the costs of this action and prejudgment interest.

### AS AND FOR A THIRD CAUSE OF ACTION
### ON BEHALF OF FELIX AGAINST THE DOE
### FOR RETALIATION IN VIOLATION OF THE ADA

107.    Felix repeats, re-alleges and incorporates in full paragraphs 1 through 106 of this Complaint, as though fully set forth at length herein.

108.    Each time that Felix opposed the DOE's discriminatory conduct, she was engaged in a protected activity under the law, of which the DOE was aware.

15

109.    As a causal and proximate result of Felix engaging in a protected activity under the law, Felix was subjected to retaliation, all of which adversely and severely impacted upon her position, career and well-being, and which would be reasonably likely to deter a person from engaging in protected activity in the future.

110.    Felix has been personally and professionally humiliated, demeaned and degraded, all of which has been caused by the DOE's conduct in violation of Felix's human rights.

111.    The aforementioned acts of the DOE constitute unlawful retaliation against Felix in violation of the ADA, 42 U.S.C. §12203(a), which provides, *inter alia*, that:

> No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter.

112.    As a direct and proximate result of the DOE's conduct complained of herein, and as alleged in this Cause of Action, as well as the conduct set forth in this Complaint, Felix has suffered damages, which include the emotional pain and suffering Felix has been caused to suffer, so that Felix seeks in this Third Cause of Action compensatory damages in an amount to be determined at a trial of this matter, as well as reasonable attorney's fees, the costs of this action and pre-judgment interest.

## JURY DEMAND

Plaintiff hereby demands a trial by jury.

**WHEREFORE**, Plaintiff Cynthia Felix demands judgment against Defendant the New York City Department of Education on the First Cause of Action for compensatory damages in an amount to be determined at trial; on the Second Cause of Action for compensatory damages in an

amount to be determined at trial; on the Third Cause of Action for compensatory damages in an amount to be determined at trial; as well as costs, pre-judgment interest and attorney's fees as permitted under the law, and for such other relief as this Court deems just and proper.

**SCHWARTZ PERRY & HELLER, LLP**
*Attorneys for Plaintiff*

By:_____
   DAVIDA S. PERRY
   BRIAN HELLER
   3 Park Avenue, Suite 2700
   New York, NY 10016
   (212) 889-6565

17