UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X
                                   :
CYNTHIA FELIX,                      :
                   Plaintiff, :
                                     :            21 Civ. 6109 (LGS)
       -against-                  :
                                     :       **OPINION AND ORDER**
NEW YORK CITY DEPARTMENT OF     :
EDUCATION,
                        Defendant. :
------------------------------------------------------------ X

LORNA G. SCHOFIELD, District Judge:

       Plaintiff Cynthia Felix brings this employment discrimination action against Defendant

New York City Department of Education (the "DOE").  Plaintiff claims violations of the

Americans with Disabilities Act (the "ADA") in the form of discrimination on the basis of her

disability, failure to accommodate, retaliation and hostile work environment.  Defendant moves

for summary judgment on all of Plaintiff's claims.  For the reasons below, Defendant's motion is

granted in part and denied in part.

## I.     BACKGROUND

       The following facts are drawn from the parties' Rule 56.1 statements and other

submissions on this motion.  The facts are undisputed or based on record evidence drawing all

reasonable inferences in favor of Plaintiff as the non-moving party.  *See N.Y. State Teamsters*

*Conf. Pension & Ret. Fund v. C & S Wholesale Grocers, Inc.*, 24 F.4th 163, 170 (2d Cir. 2022).

In considering Defendant's motion for summary judgment, the Court is "required to accept all

sworn statements by [Plaintiff] as to matters on which she [is] competent to testify, including

what she did, what she observed, and what she was told by company managers."  *Davis-Garett v.*

*Urban Outfitters, Inc.*, 921 F.3d 30, 46 (2d Cir. 2019).  The Court also "must disregard all

evidence favorable to [Defendant] that the jury is not required to believe," that is, "give credence to the evidence favoring [Plaintiff] as well as that evidence supporting [Defendant] that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses."  *Id.* (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000)).  The facts as summarized below reflect these principles.

### A.      Plaintiff's Experience at the DOE

Plaintiff started working for the DOE in 1991 as a teacher in Harlem, New York.  From 2017 to 2019, Plaintiff was the Senior Director of Bilingual Programs for the Division of Multilingual Learners.  Plaintiff worked in an office in downtown Manhattan known as the "Tweed Courthouse" ("Tweed").

Plaintiff suffers from several medical conditions.  As a child, Plaintiff was diagnosed with asthma.  In 2006, Plaintiff was diagnosed with atrial septal defect.  In 2014 or 2015, Plaintiff was diagnosed with Chronic Obstructive Pulmonary Disease ("COPD"), pulmonary fibrosis and hypertension.  In 2016 or 2017, Plaintiff was diagnosed with atrial tachycardia and flutter and arrhythmia.

### B.      Plaintiff's New Position as an Instructional Specialist

On July 24, 2019, Plaintiff met with Alicia Roman,[1] former Chief Operating Officer for the Office of the Chief Academic Officer, and Mirza Sanchez-Medina, Plaintiff's then immediate supervisor.  Plaintiff's job title was changed to "instructional specialist," a position that Plaintiff currently holds.  An instructional specialist is responsible for reviewing home instruction plans submitted by parents who homeschool their children and providing those parents with guidance

---

[1] Defendant refers to Alicia Roman née Dorsey as "Ms. Roman," which is assumed to be her preference.  Plaintiff uses "Ms. Dorsey," as that name appears in the record.  This opinion uses "Roman" rather than "Dorsey."

and support concerning the guidelines on homeschooling.  Roman and Sanchez-Medina informed Plaintiff that her new job would be located in Long Island City, New York, and that as of July 25, 2019, Plaintiff would no longer be working at Tweed.  Plaintiff explained that she could not medically tolerate the long commute to Long Island City ("LIC") and asked Roman if she could be assigned to an office in Brooklyn.  Plaintiff never refused the LIC assignment nor did she indicate that she would be returning to Tweed the next day.

When Plaintiff left Tweed on July 24, 2019, she left her Tweed ID on her desk.  Tatevik Garibyan, former division chief of operations, acting on the advice of Roman, submitted a request to deactivate the ID.  As a result of Garibyan's request, the Department of Citywide Administrative Services (the "DCAS") created a "security alert" for Plaintiff.  Garibyan and Roman were aware of the alert and allowed it to remain in place.  Between July 24, 2019, and August 1, 2019, a photograph of Plaintiff was posted at the first-floor security desk at Tweed. The photograph had a red banner above Plaintiff's picture that stated "Alert."  Plaintiff felt upset by the posting of her photograph.

On August 1 and 2, 2019, Garibyan and Carl Giaimo, a former DOE director, requested DCAS to move Plaintiff's photograph to a less visible location in deference to employee privacy. On August 2, 2023, DCAS stated that it could not "honor this request as we do not have permanent personnel assigned to the building.  This is to ensure that individual does not walk by the guard on duty."  On August 12, 2019, Giaimo emailed DCAS and requested that the alert placed on Plaintiff be removed because her Tweed ID had been deactivated and requested that Plaintiff be permitted to enter Tweed when escorted by another Tweed employee.

### C.    Plaintiff's Accommodation Requests

On August 6, 2019, Plaintiff submitted an accommodation request form (the "August 6 Request") to DOE Human Resources.  In the August 6 Request, Plaintiff wrote:

> I have a complex medical history that includes [congenital] heart disease, cardiac [arrhythmia], COPD, pulmonary hypertension and neuropathy. I am unable to travel long distances and have limits set by my doctor due to my disability. . . . I am requesting a job location in Brooklyn NY as an EA 41 (my current position). The supervisory postings (NYC DOE careers) have [comparable] positions in Brooklyn that would allow me to fulfill my job duties without compromising my health. I cannot travel to Vernon Blvd location as it [is] a medical hardship.

On August 9, 2019, the DOE granted the August 6 Request. Plaintiff was assigned office space on Court Street in Brooklyn, New York ("Court Street"). Plaintiff's salary, duties and responsibilities stayed the same after her August 6 Request was granted.

On August 26, 2019, Plaintiff reported to Court Street. She was assigned office space in Room 411, on the fourth floor. Plaintiff described the room as an interior office with stuffy and poor air quality, no windows, no Wi-Fi, no ventilation and no air conditioning. Plaintiff and some members of her team were assigned to the same room because it was "important that they stay together."

On August 26, 2019, Plaintiff submitted another accommodation request form (the "August 26 Request"). In this request, Plaintiff stated:

> I have a complex medical history including [congenital] heart disease, cardiac [arrhythmia] [and] pulmonary disease. I was recently diagnosed with job related chronic stress, anxiety and depression that affects my mental health [and] exacerbates my cardiovascular disease and has caused increased abnormal heart heart [sic] rhythms. This has been caused by the retaliatory actions of Ms. Alicia [Roman] who after I asked for an [sic] location accommodation and she denied it she placed my picture at Tweed Courthouse with restricted access causing me great stress and anxiety affecting my disability.

Plaintiff requested that she be reassigned to a vacant position in Brooklyn for which she applied and was qualified. Plaintiff's August 26 Request was denied because it was "not medically warranted."

On August 27, 2019, Plaintiff emailed Vivian Walton-Smalls, a DOE disability attorney, complaining that Room 411 was a "large windowless room that has no air

4

conditioning, unclear office surfaces, has boxes all over the space and it has poor wireless service." Plaintiff explained that she is dependent on wireless service for her heart monitor and suffered from a COPD episode and migraine due to the poor air circulation in the room. Plaintiff reiterated her request for a new position and asked to "be assigned to another space that is more appropriate."

On August 30, 2019, Walton-Smalls informed Plaintiff, "Your department tried but unfortunately could not locate another desk/space for you in 65 Court Street." The DOE ordered Plaintiff an air purifier and told her that, because wireless service could be good or spotty, even within a floor, she could "takes breaks as necessary to reconnect with the service and to allow for better readings." On September 4, 2019, Plaintiff reported to Walton-Smalls, "The conditions of the room remain the same. The air quality is very poor and stifling. I continue to feel ill and have had to increase the use of my inhaler from the effects. I would like to inform you that the room has 2 air purifiers and they have not helped my respiratory or cardiac conditions." On September 11, 2019, Walton-Smalls informed Plaintiff that "it would be an undue burden for your department to relocate you again since you work with your team and there is no space in 65 Court Street that can house your team size at this time."

Plaintiff subsequently retained the services of Disability Rights New York, a legal services organization. On November 20, 2019, Disability Rights New York renewed Plaintiff's request to be moved to an appropriate office. On February 20, 2020, the DOE offered Plaintiff a "desk on the 10th floor" of Court Street. Plaintiff understood the office to be the room where teachers and supervisors were assigned when disciplinary action was pending and was also known as the "Rubber Room." Plaintiff also had concerns

about being situated on the tenth floor because her work materials were received on the fourth floor.  On February 25, 2020, Plaintiff rejected the DOE's proposed accommodation of space on the tenth floor of Court Street as an unreasonable proposal that "would entail a lot of up and down between the 10th and 4th floor."  Plaintiff suggested other rooms on the fourth floor as alternatives.

On March 16, 2020, Defendant informed Plaintiff that there were no desks available to Plaintiff's team on the fourth floor and asked whether Plaintiff would like the desk on the tenth floor.  On March 27, 2020, Plaintiff again turned down Defendant's offer, stating that it would not permit Plaintiff to "perform the essential functions of her job" as, during this time, parents submitted the home instruction plans primarily in hard copy to the fourth floor.

In March 2020, Plaintiff began working remotely from her home due to the closure of offices stemming from the COVID-19 pandemic.  In October 2021, Plaintiff and her team were moved to the second floor of Court Street.  The space on the second floor of Court Street has windows and allows Plaintiff to connect to Wi-Fi.

### D.   Incidents at the DOE

Plaintiff has identified a number of incidents that, in her view, demonstrate retaliation by the DOE.

#### 1.  Galaxy System

On July 27, 28 or 29, 2019, Plaintiff received an email from Linda Chen, a former DOE officer, requesting to meet to discuss an allegation of reported misconduct.  On July 30, 2019, Chen met with Plaintiff to discuss Plaintiff's alleged unauthorized use of the DOE's Galaxy data system.

According to Garibyan, on June 19, 2023, Plaintiff viewed confidential information on Galaxy by accessing it with another DOE employee who was permitted access.  On August 30, 2019, Plaintiff received a letter to file as a result of the alleged misconduct.  Plaintiff did not inform Chen or Garibyan on July 24, 2019, or thereafter, that she requested a reasonable accommodation from Roman on that date.

### 2.  Entering Tweed

On September 18, 2019, Plaintiff entered Tweed to drop off paperwork and pick up her paystub.  At the DCAS desk, Plaintiff was told that she could not enter the building.  Plaintiff felt mortified, distressed and humiliated.  On September 19, 2019, Giaimo emailed DCAS about the incident.  He referred DCAS to his August 12, 2019, email and stated "there is to be no further restriction on [Plaintiff] entering the building once a site employee has been contacted and she has someone to escort her, per normal building procedure."  On the same day, DCAS apologized to the DOE for its "mix up" and instructed the front desk to allow Plaintiff entry to Tweed with a DOE employee without restriction.  Soon after, Roman emailed DCAS stating: "Just to be clear, [Plaintiff] can enter the building just like any other DOE employee.  She doesn't need an escort."  Since September 19, 2019, Plaintiff has entered Tweed and her access has not been denied.

### 3.  Job Title and Leave Day

On October 4, 2019, Plaintiff was asked to confirm her current title for a workshop where Plaintiff was scheduled to appear.  Plaintiff provided information about her title to a program facilitator assigned to her.

Plaintiff obtained approval to use leave to attend the event and so advised Ilene Altschul, Plaintiff's then supervisor.  The program materials distributed at the event on October 21, 2019,

identified Plaintiff as "Senior Director of Bilingual Programs NYC DOE," which was not Plaintiff's title at the time.

On November 8, 2019, Altschul and Plaintiff met to discuss Plaintiff's alleged failure to obtain approval prior to taking leave on October 21, 2019.  On December 3, 2019, the two met again to discuss whether Plaintiff misrepresented her title at the workshop.  Plaintiff denies any such wrongdoing.  On January 9, 2020, a letter from Altschul regarding the November 8 and December 3, 2019, incidents was placed in Plaintiff's file.  Plaintiff did not receive any other discipline and Plaintiff's salary, job benefits and job duties and responsibilities did not change as a result of the January 9, 2020, letter being placed in her file.

Plaintiff filed a charge of unlawful discrimination and retaliation against Defendant with the Equal Employment Opportunity Commission ("EEOC") on December 11, 2020, and received a Notice of Right to Sue on July 13, 2021.

## II.    STANDARD

Summary judgment is appropriate where the record establishes that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "An issue of fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Frost v. N.Y.C. Police Dep't*, 980 F.3d 231, 242 (2d Cir. 2020) (quoting *SCR Joint Venture L.P. v. Warshawsky*, 559 F.3d 133, 137 (2d Cir. 2009)).  "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment."  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 248 (1986); *accord Saleem v. Corp. Transp. Grp.*, 854 F.3d 131, 148 (2d Cir. 2017).

In evaluating a motion for summary judgment, a court must "construe the record evidence in the light most favorable to the non-moving party and draw all reasonable inferences

in its favor." *Torcivia v. Suffolk Cty.*, 17 F.4th 342, 354 (2d Cir. 2021). When the movant

properly supports its motion with evidentiary materials, the opposing party must establish a

genuine issue of fact by citing to particular parts of materials in the record. *See* Fed. R. Civ. P.

56(c)(1)(A). "A party opposing summary judgment normally does not show the existence of a

genuine issue of fact to be tried merely by making assertions that are based on speculation or are

conclusory." *S. Katzman Produce Inc. v. Yadid*, 999 F.3d 867, 877 (2d Cir. 2021).

## III.   DISCUSSION

### A.   Discrimination Claim

Plaintiff alleges that she was discriminated against on the basis of her disability.

Defendant's motion for summary judgment is granted with respect to the discrimination claim.

The ADA provides that "[n]o covered entity shall discriminate against a qualified

individual on the basis of disability in regard to . . . the hiring, advancement, or discharge of

employees . . . and other terms, conditions, and privileges of employment." 42 U.S.C.

§ 12112(a). "Claims alleging disability discrimination in violation of the ADA are subject to the

burden-shifting analysis originally established by the Supreme Court in *McDonnell Douglas*

*Corp. v. Green*, 411 U.S. 792 (1973)." *McMillan v. City of New York*, 711 F.3d 120, 125 (2d

Cir. 2013).[2] "Under this framework, a plaintiff bears the initial burden of establishing a *prima*

*facie* case of discrimination." *Smith v. N.Y. & Presbyterian Hosp.*, 440 F. Supp. 3d 303, 328

(S.D.N.Y. 2020). To establish a prima facie case of discrimination under the ADA, a plaintiff

must show by a preponderance of the evidence that: (1) her employer is subject to the ADA; (2)

she was disabled within the meaning of the ADA; (3) she was otherwise qualified to perform the

essential functions of her job, with or without reasonable accommodation and (4) she suffered

---

[2] Unless otherwise indicated, in quoting cases, all internal quotation marks, alterations, emphases, footnotes and citations are omitted.

adverse employment action because of her disability.  *See Woolf v. Strada*, 949 F.3d 89, 93 (2d Cir. 2020).

"Once a plaintiff has established a *prima facie* case, a presumption arises that more likely than not the adverse conduct was based on the consideration of impermissible factors."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 83 (2d Cir. 2015).  "At that point, the burden of production shifts to the employer to 'articulate some legitimate, nondiscriminatory reason' for the disparate treatment."  *Smith*, 440 F. Supp. 3d at 328 (quoting *Vega*, 801 F.3d at 83); *see also Walsh v. N.Y.C. Hous. Auth.*, 828 F.3d 70, 75 (2d Cir. 2016).

"If the employer carries that burden, the plaintiff's admissible evidence must show circumstances that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Walsh*, 828 F.3d at 75.  "To avoid summary judgment in an employment discrimination case, the plaintiff is not required to show that the employer's proffered reasons were false or played no role in the employment decision, but only that they were not the only reasons and that the prohibited factor was at least one of the 'motivating' factors."  *Holcomb v. Iona Coll.*, 521 F.3d 130, 138 (2d Cir. 2008); *accord Smith*, 440 F. Supp. 3d at 328.

Defendant argues that the discrimination claim should be dismissed because (1) Plaintiff does not have a disability within the meaning of the ADA and (2) Plaintiff did not suffer any adverse employment action.

### 1.  Disability under the ADA

A triable question of fact exists as to whether Plaintiff has a disability within the meaning of the ADA.  "Courts apply a three-part test to determine whether a plaintiff has an actual disability under the ADA."  *Cody v. Cty. of Nassau*, 577 F. Supp. 2d 623, 637 (E.D.N.Y. 2008)

(quoting *Sussle v. Sirina Prot. Sys. Corp.*, 269 F. Supp. 2d 285, 296 (S.D.N.Y. 2003)), *aff'd*, 345 F. App'x 717 (2d Cir. 2009).  "[A] plaintiff must: (1) show that she suffers from a physical or mental impairment; (2) identify the activity claimed to be impaired and establish that it constitutes a major life activity; and (3) show that her impairment substantially limits the major life activity previously identified."  *Norman v. NYU Langone Health Sys.*, 492 F. Supp. 3d 154, 163 (S.D.N.Y. 2020) (quoting *Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138, 147 (2d Cir. 2002)), *aff'd*, 2021 WL 5986999 (2d Cir. Dec. 17, 2021).

EEOC regulations implementing the ADA define physical or mental impairment to include "[a]ny physiological disorder or condition, cosmetic disfigurement, or anatomical loss affecting one or more body systems, such as neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genitourinary, immune, circulatory, hemic, lymphatic, skin, and endocrine."  29 C.F.R. § 1630.2(h)(1).

"Under the ADA, 'major life activities' include, but are not limited to, 'caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working,' 42 U.S.C. § 12102(2)(A), as well as the operation of major bodily functions, including 'neurological, brain, respiratory, circulatory, endocrine, and reproductive functions,' *id.* § 12102(2)(B)."  *Norman*, 492 F. Supp. 3d at 163.

"To determine what constitutes a 'substantial limitation' of a major life activity, courts have looked to the EEOC regulations implementing the ADA.  Although the regulations are not binding, courts in the Second Circuit afford them significant deference."  *Id.*  In 2008, Congress amended the ADA and "instructed courts that the definition of disability . . . shall be construed in favor of broad coverage of individuals, and that an impairment that substantially limits one major

life activity need not limit other major life activities in order to be considered a disability." *Woolf*, 949 F.3d at 94.  The "principal purpose" of these amendments was to "make clear that the substantial-limitation requirement in the definition of 'disability' is not an exacting one."  *Id.*

Construing the record evidence in the light most favorable to Plaintiff as the non-moving party, a reasonable jury could find that Plaintiff has a disability under the ADA.  First, she suffers from, among other conditions, COPD, congenital heart disease and cardiac arrhythmia, which qualify as physiological disorders or conditions affecting the respiratory and cardiovascular systems.  There is no genuine dispute that Plaintiff suffered from those conditions during the events at issue.  Second, Plaintiff has identified breathing and the operation of the circulatory system as major life activities that have been impaired by her medical condition. These are major life activities under the ADA.  42 U.S.C. § 12102(2)(A); *Shine v. N.Y.C. Hous. Auth.*, No. 19 Civ. 4347, 2020 WL 5604048, at *7 (S.D.N.Y. Sept. 18, 2020) ("[B]reathing is a major life activity under the ADA and the operation of major bodily functions, including respiratory functions, constitutes a major life activity.").  Third, by causing Plaintiff to experience episodes of fainting, dizziness and asthma attacks, Plaintiff's medical conditions limit her major life activities.  "[T]he substantial-limitation requirement in the definition of 'disability' is not an exacting one."  *Woolf*, 949 F.3d at 94.  The EEOC regulations provide that "[a]n impairment is a disability within the meaning of this section if it substantially limits the ability of an individual to perform a major life activity as compared to most people in the general population."  29 C.F.R. § 1630.20(j)(1)(ii).  A reasonable jury could conclude that, as compared to most people in the general population, experiencing difficulty breathing, fainting, episodes of dizziness and asthma attacks due to, among other conditions, COPD, congenital heart disease and cardiac arrhythmia, constitutes a substantial limitation of a major life activity.

Defendant's arguments to the contrary are unavailing.  Defendant suggests that Plaintiff identifies for the first time in her memorandum of law "breathing" and the "operation" of the circulatory system as the major life activities, and that doing so is improper.  But the Amended Complaint discusses Plaintiff's "history of fainting due to some of her medical conditions," her need for "proper ventilation" in the office and reliance on her "cardiac monitor."  These allegations sufficiently identify the activities Plaintiff claims to be impaired.  Defendant argues also that Plaintiff does not cite any medical evidence in the record and therefore cannot establish that she is disabled.  However, the "Second Circuit has not taken a clear position on [the] issue . . . that medical evidence is . . . absolutely necessary to support a claim of disability under the ADA." *Anderson v. Nat'l Grid, PLC*, 93 F. Supp. 3d 120, 137 (E.D.N.Y. 2015).  Plaintiff provided sworn testimony that she was diagnosed with COPD, atrial tachycardia and flutter and arrhythmia, among other conditions.

### 2.  Adverse Employment Action

Plaintiff raises five factual theories of how the DOE discriminated against her: by (1) refusing to engage in the interactive process, (2) denigrating and humiliating Plaintiff by stating she was terminated when she was not, (3) demeaning Plaintiff by posting her photograph at headquarters with a statement that she was denied access, (4) wrongfully accusing Plaintiff of unprofessional conduct and (5) assigning Plaintiff to work in Room 411, a dirty, windowless room.  Construing the record in the light most favorable to Plaintiff and drawing reasonable inferences in her favor, none of theories one through four constitutes an adverse employment action for purposes of a discrimination claim.

"To qualify as an adverse employment action, the employer's action toward the plaintiff must be materially adverse with respect to the terms and conditions of employment." *Davis v.*

*N.Y.C. Dept. of Educ.*, 804 F.3d 231, 235 (2d Cir. 2015).  It must be "more disruptive than a mere inconvenience or an alteration of job responsibilities." *Id.*  "Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices . . . unique to a particular situation." *Sanders v. N.Y.C. Human Resources Admin.*, 361 F.3d 749, 755 (2d Cir. 2004); *accord Smith v. City of New York*, No. 16 Civ. 9244, 2018 WL 3392872, at *3 (S.D.N.Y. July 12, 2018).

As to the theory that the DOE failed to engage in the interactive process, the failure to provide a reasonable accommodation in and of itself does not equate to an adverse employment action, *see Fox v. Costco Wholesale Corp.*, 918 F.3d 65, 72 (2d Cir. 2019); *accord Timmer v. City Univ. of New York*, No. 20 Civ. 2554, 2021 WL 3603465, at *5 (E.D.N.Y. Aug. 13, 2021), though it can be the basis for a separate failure to accommodate claim as discussed below.  The next three theories -- that Plaintiff was denigrated and humiliated, demeaned and wrongfully accused of unprofessional conduct -- are also insufficient.  While these might be the basis for a hostile work environment claim if motivated by discriminatory animus or a retaliation claim if motivated by retaliatory animus, they are not adverse employment actions sufficient to support an ADA discrimination claim.  The record identifies no evidence that the DOE's actions were "materially adverse with respect to the terms and conditions of employment." *Davis*, 804 F.3d at 235.  Plaintiff's salary, job benefits and job responsibilities remained the same.  Any "alleged embarrassment, humiliation, harm to reputation, depression, disability, [or] general decrease on 'quality of life' did not impact the terms or conditions of [Plaintiff's] employment and are likewise not adverse employment actions." *Castro v. Mitchell*, No. 9 Civ. 3754, 2011 WL 10901797, at *4 (S.D.N.Y. Aug. 25, 2011); *see also Linell v. N.Y.C. Dep't of Educ.*, No. 15 Civ.

5085, 2018 WL 1611370, at *7 (E.D.N.Y. Mar. 30, 2018) ("Reprimands or negative evaluation letters constitute adverse employment actions only when they trigger negative consequences to the conditions of employment.").

Assuming without deciding that the fifth theory -- Plaintiff's assignment to work in Room 411 -- constitutes an adverse employment action, the DOE articulates a legitimate, non-discriminatory basis for the assignment: that the room was large enough to accommodate Plaintiff and her team, and it was "important that they stay together."  Plaintiff offers no evidence in rebuttal "that would be sufficient to permit a rational finder of fact to infer that the defendant's employment decision was more likely than not based in whole or in part on discrimination."  *Walsh*, 828 F.3d at 75.  Neither the timing nor the context gives rise to the inference that Plaintiff's assignment was bound up with her disability -- that some members of Plaintiff's team did not work at Court Street but instead were located in Manhattan does not, without more, overcome the DOE's justification.  Accordingly, Defendant's summary judgment motion as to the discrimination claim is granted.

### B.    Failure to Accommodate Claim

Plaintiff alleges that the DOE failed to grant her a reasonable accommodation in violation of the ADA.  The DOE contends that Plaintiff is not disabled -- addressed above -- and was in fact granted accommodations.  Defendant's motion for summary judgment is denied with respect to this claim.

Failure to accommodate is a type of disability discrimination that also follows the *McDonnell Douglas* burden-shifting scheme.  *See Berger v. N.Y.C. Police Dep't*, 304 F. Supp. 3d 360, 368 (S.D.N.Y. 2018).  The standard for a failure-to-accommodate claim is identical to that of a discrimination claim except that, "for the fourth factor, [Plaintiff] must show by a preponderance of the evidence that [her] employer refused to make a reasonable

15

accommodation." *Owens v. City of New York Dep't of Educ.*, No. 21-2875, 2022 WL 17844279, at *1 (2d Cir. Dec. 22, 2022).

Although "[t]he reasonableness of an employer's accommodation is a 'fact-specific' question that often must be resolved by a factfinder," where an "employer has already taken (or offered) measures to accommodate the disability, the employer is entitled to summary judgment if, on the undisputed record, the existing accommodation is 'plainly reasonable.'" *Noll v. Int'l Bus. Machines Corp.*, 787 F.3d 89, 94 (2d Cir. 2015); *see also Gronne v. Apple Bank for Sav.*, 1 F. App'x. 64, 67 (2d Cir. 2001) (summary order) ("Summary judgment is . . . appropriate where a plaintiff fails to identify a facially reasonable accommodation that the defendant refused to provide, or when the employer offers an accommodation that is plainly reasonable."). If the proposed accommodation is "plainly reasonable," "[t]here is no need to engage in further burden-shifting to consider whether the employee's requested accommodation would have been reasonable." *Noll*, 787 F.3d at 94; *see also Kelly v. Starwood Hotels & Resorts Worldwide, Inc.*, 15 Civ. 6309, 2017 WL 1133433, at *3 (S.D.N.Y. Mar. 24, 2017) (explaining that where an employer has "allegedly declined to offer a reasonable accommodation . . . courts apply the [*McDonnell Douglas*] burden-shifting framework," but that if the employer has taken or offered measures to accommodate the disability, the employer is entitled to summary judgment if the accommodation is "plainly reasonable").

"A reasonable accommodation is one that 'enables an individual with a disability who is qualified to perform the essential functions of that position . . . or to enjoy equal benefits and privileges of employment.'" *Noll*, 787 F.3d at 94 (quoting 29 C.F.R. § 1630.2(o)(1)). A reasonable accommodation can "take many forms, but it must be effective." *Id.* at 95; *see also Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 189 (2d Cir. 2015)

("The hallmark of a reasonable accommodation is effectiveness.").  However, an employer is "not required to provide a perfect accommodation or the very accommodation most strongly preferred by the employee." *Noll*, 787 F.3d at 95; *see also Goonan v. Fed. Reserve Bank of N.Y.*, 916 F. Supp. 2d 470, 479 (S.D.N.Y. 2013) ("[T]he employer providing the accommodation has the ultimate discretion to choose between effective accommodations, and may choose the less expensive accommodation or the accommodation that is easier for it to provide.").  Given that the determination of whether something constitutes a reasonable accommodation "is necessarily fact-specific . . . determinations on this issue must be made on a case-by-case basis." *Wernick v. Fed. Rsrv. Bank of New York*, 91 F.3d 379, 385 (2d Cir. 1996).

Under the burden-shifting framework applied in these cases, after the plaintiff satisfies her burden of "production and persuasion as to the existence of an accommodation that is facially reasonable," the burden "shifts to the defendant to rebut the reasonableness of the proposed accommodation," which "is in essence equivalent to the burden of showing, as an affirmative defense, that the proposed accommodation would cause the defendant to suffer an undue hardship." *Wright v. N.Y. State Dep't of Corr.*, 831 F.3d 64, 76 (2d Cir. 2016).  An undue hardship is defined as "an action requiring significant difficulty or expense."  42 U.S.C. § 12111(10)(A).  Factors to be considered by the employer in determining whether an accommodation would impose an undue hardship may include: "(i) the nature and cost of the accommodation . . . ; (ii) . . . the number of persons employed at [the] facility [involved]; the effect on expenses and resources, or the impact otherwise of such accommodation upon the operation of the facility; (iii) . . . the overall size of the business of a covered entity with respect to the number of its employees; and (iv) . . . the composition, structure, and functions of the workforce of such entity." *Id.* § 12111(10)(B).  "[A]n employer seeking to meet its burden of

persuasion must evaluate the hardship sought to be imposed through the lens of the factors listed in the regulations, and show special (typically case-specific) circumstances demonstrating undue hardship in the particular circumstances." *Greenbaum v. N.Y.C. Transit Auth.*, No. 21-1777, 2022 WL 3347893, at *4 (2d Cir. Aug. 15, 2022).

A reasonable jury could find that the DOE failed to make reasonable accommodation for Plaintiff's disability by denying her request to transfer out of Room 411. The office had stuffy and poor air quality, poor ventilation, no windows, a moldy odor, no Wi-Fi and, in fact, caused Plaintiff to develop a migraine and a COPD episode within hours. The DOE provided two air purifiers, which did not improve Plaintiff's respiratory and circulatory conditions. Such conditions would reasonably inhibit someone with Plaintiff's disability from performing "the essential functions of [her] position" and from enjoying "equal benefits and privileges of employment." *See Noll*, 787 F.3d at 94. That Plaintiff did not specifically request an office space with windows or Wi-Fi connection does not, as Defendant suggests, make the accommodation necessarily reasonable. On August 27, 2019, Plaintiff emailed Walton-Smalls explaining why Room 411 was not suitable for her health and requested to "be assigned to another space that is more appropriate." On August 30, 2019, Plaintiff was informed that her department tried, but failed, to locate another office for her in Court Street. Plaintiff reiterated her request on September 4, 2019, as she continued to feel ill and had to increase the use of her inhaler. On September 11, 2019, the DOE denied the request as an undue burden.

Viewing the record in a light most favorable to Plaintiff, Plaintiff has met her initial, "modest" burden of proposing "the existence of a plausible accommodation, the costs of which, facially, do not clearly exceed its benefits." *Greenbaum*, 2022 WL 3347893, at *3. Plaintiff suggested other empty rooms on the fourth floor, including the space next to Room 411, as

reasonable alternatives that would allow her to perform the essential functions of her employment. *See id.* Rooms 403 or 405 had windows, were on the same floor as her then office and would make it "much more feasible for her to obtain the instructional plans for review" than an office on the tenth floor. These rooms suffice as plausible accommodations. Plaintiff's testimony that she was "aware of other vacant desks" on her floor is not, as Defendant suggests, mere "[s]peculation and conjecture" that such offices were available and therefore possible alternatives.

Nor were the measures offered to accommodate Plaintiff's disability -- i.e., assignment to Room 411 or the "Rubber Room" -- "plainly reasonable." *See Noll*, 787 F.3d at 94. Assignment to Room 411 was not plainly reasonable for reasons explained above. The "Rubber Room" was an office where teachers and supervisors were assigned when a disciplinary action was pending. Being transferred to the Rubber Room would create the impression of Plaintiff's wrongdoing, particularly in light of the security alert issued about her. Further, an office on the tenth floor would have made it meaningfully more difficult for Plaintiff to do her job, as all of her paperwork was located on fourth floor, including individual homeschooling plans which were primarily submitted in hard copy. In response, Defendant argues that Plaintiff inappropriately proffers facts about the "Rubber Room" for the first time in her memorandum of law in opposition to summary judgment, and that such facts should not be considered. The argument is unpersuasive as a plaintiff is not required to plead in her complaint facts surrounding, what amounts to, an affirmative defense. Accordingly, neither Plaintiff's existing accommodation nor the DOE's proposal of moving Plaintiff to the Rubber Room was "plainly reasonable."

At step two of the burden-shifting framework, the "undue hardship" issue cannot be decided on this summary judgment record. Defendant cites only an email sent by Walton-

Smalls, which informed Plaintiff that "it would be an undue burden for your department to relocate you again since you work with your team and there is no space in 65 Court Street that can house your team size at this time."  Defendant then claims that "Plaintiff has no evidence to even suggest that this legitimate, non-discriminatory reason was pretextual."  However, Plaintiff satisfied her burden of "production and persuasion as to the existence of an accommodation that is facially reasonable."  *Wright*, 831 F.3d at 76.  The burden therefore "shifts to the defendant to rebut the reasonableness of the proposed accommodation."  *Id.*  Quoting a single email, and addressing none of the factors to be considered in determining whether an accommodation would impose an undue hardship, Defendant fails to meet that burden here.

Finally, Defendant argues that Plaintiff cannot recover on her failure-to-accommodate claim because Plaintiff was eventually granted the accommodation she requested -- in October 2021, the DOE moved Plaintiff and her team to the second floor of Court Street.  The argument is unavailing, as a reasonable jury could conclude that requiring Plaintiff to work in Room 411 for even six months, when Plaintiff made clear the effects on her health, demonstrates the lack of "good faith efforts . . . to identify and make a reasonable accommodation."  *See* 42 U.S.C. § 1981a(a)(2).  Defendant's summary judgment motion as to the failure-to-accommodate claim is therefore denied.

### C.   Retaliation Claim

Plaintiff alleges that the DOE retaliated against her for requesting a reasonable accommodation.  Defendant's motion for summary judgment is denied with respect to the retaliation claim.

The ADA prohibits retaliation "against any individual because such individual has opposed any act or practice made unlawful by th[e] [ADA] or . . . made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this

chapter."  42 U.S.C. § 12203(a).  "Like discrimination claims, retaliation claims are analyzed

using the *McDonnell Douglas* burden-shifting framework."  *Frantti v. New York*, 850 F. App'x

17, 21 (2d Cir. 2021) (summary order); *Lovejoy-Wilson v. NOCO Motor Fuel, Inc.*, 263 F.3d

208, 223 (2d Cir. 2001) ("We analyze a retaliation claim under the ADA using the same

framework employed in Title VII cases.").  To establish a prima facie case for retaliation, a

plaintiff must show that "(1) [she] was engaged in an activity protected by the ADA, (2) [her]

employer was aware of that activity, (3) an employment action adverse to the plaintiff occurred,

and (4) there existed a causal connection between the protected activity and the adverse

employment action."  *Sarno v. Douglas Elliman-Gibbons & Ives, Inc.*, 183 F.3d 155, 159 (2d

Cir. 1999).  Seeking reasonable accommodation for a disability constitutes a "protected activity,"

and retaliation in response to a plaintiff's request for reasonable accommodation may violate the

ADA's prohibition on retaliation.  *See Weixel v. Bd. of Educ. of City of New York*, 287 F.3d 138,

149 (2d Cir. 2002) ("[P]laintiffs do allege that they were seeking reasonable accommodation of

[plaintiff's] disability -- which constitutes protected activity under Section 504/ADA."); *accord*

*Rodriguez v. Atria Sr. Living Grp., Inc.*, 887 F.Supp.2d 503, 512 (S.D.N.Y. 2012).  Once a

plaintiff establishes a prima facie case, the burden then shifts to the defendant to articulate a

legitimate non-retaliatory reason for the challenged employment action.  "If the defendant meets

the burden, the plaintiff must adduce evidence 'that would be sufficient to permit a rational

factfinder to conclude that the employer's explanation is merely a pretext for impermissible

retaliation.'"  *Frantti*, 850 F. App'x at 21 (quoting *Treglia v. Town of Manlius*, 313 F.3d 713,

721 (2d Cir. 2002)).

 A causal relationship between the protected activity and the alleged retaliatory act can be

established in one of two ways: "(1) indirectly, by showing that the protected activity was

followed closely by discriminatory [or retaliatory] treatment, or through other circumstantial evidence such as disparate treatment of fellow employees who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by defendant." *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019).

The adverse-action standard for retaliation "covers a broader range of conduct than does the adverse-action standard for claims of discrimination."  *Vega v. Hempstead Union Free Sch. Dist.*, 801 F.3d 72, 90 (2d Cir. 2015).  It is "any action that could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Id.* (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 57 (2006)).  With respect to adverse actions in the retaliation context, the Supreme Court has cautioned that:

> Context matters.  The real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed.  A schedule change in an employee's work schedule may make little difference to many workers, but may matter enormously to a young mother with school-age children.  A supervisor's refusal to invite an employee to lunch is normally trivial, a nonactionable petty slight.  But to retaliate by excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement might well deter a reasonable employee from complaining about discrimination.

*Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 69.

Plaintiff raises a genuine issue of material fact as to whether she was retaliated against for seeking a reasonable accommodation.  The claim is premised on the following incidents: (1) the security alert posted at the entrance of Tweed, (2) the "unsanitary workplace" of Room 411 and (3) allegations of misconduct relating to the Galaxy System, her job title and taking leave.  There is no genuine dispute that Plaintiff engaged in protected activity.

A jury could find that the security alert posted at the entrance of Tweed would deter a reasonable person from requesting an accommodation.  The posting includes a photograph of

Plaintiff and a red banner that reads "Alert," and was "very visible" to employees walking by. Viewed in context, the alert implies significant misconduct and would tend to harm one's reputation and personal relationships in the workplace. *See id.* at 57 (In order to support a claim for retaliation, the adverse action "must be harmful to the point that [it] could well dissuade a reasonable worker from making or supporting a charge of discrimination."). That is especially pertinent here, as Plaintiff has worked with the DOE for over thirty years and "spent years working to build [her] positive reputation at the DOE."

A reasonable jury could likewise find a causal connection between Plaintiff's July 24, 2019, accommodation request and the security alert being posted by August 1, 2019.  Although the Second Circuit has not prescribed a specific time period between protected activity and adverse employment action that defeats (or establishes) causation, *see Burkybile v. Bd. of Educ. of Hastings-On-Hudson Union Free Sch. Dist.*, 411 F.3d 306, 314 (2d Cir. 2005), here, the intervening period was, at most, only one week, *cf., e.g., Fitzgerald v. We Co.*, No. 20 Civ. 5260, 2022 WL 952963, at *7 (S.D.N.Y. Mar. 30, 2022) ("[C]ourts in this Circuit have generally concluded that a gap of more than three months between the protected activity and the retaliatory action is insufficient, standing alone to establish a causal connection.").

Defendant argues that it "never told anyone that Plaintiff's employment with Defendant was terminated or directed anyone to post Plaintiff's picture at Tweed" -- suggesting that DCAS, a separate agency, acted on its own.  The argument is unpersuasive.  The record shows that DCAS acted on the instruction of Garibyan, who depicted Plaintiff as someone who may try to "resist[]" the collection of her ID.  Garibyan, in turn, contacted security on the "advice" of Roman.  But Plaintiff never indicated to Roman, Garibyan, or anyone else at the DOE that Plaintiff refused her new job assignment, that she would return to Tweed the next day or that she

intended to withhold her ID.  That Garibyan nevertheless implied in her email to DCAS that Plaintiff may be a security threat, construed in the light most favorable to Plaintiff and drawing reasonable inferences in Plaintiff's favor, can be viewed as the DOE's sanctioning the security alert.  That Garibyan later described the "red alert" tag as inappropriate does little to suggest otherwise.  Ultimately, the photograph of Plaintiff stayed up for almost three months.  In the alternative, Defendant argues that there is no record evidence to establish that DCAS knew that Plaintiff requested an accommodation, thus breaking the causal connection.  The argument is inapposite.  Knowledge by the employer -- the DOE -- is sufficient.

The analysis of Plaintiff's other theories of retaliation -- that she was forced to work in an unsanitary workplace and accused of misconduct -- is similar.  For substantially the reasons stated in Plaintiff's memorandum of law, Plaintiff's other theories raise issues of material fact that preclude summary judgment on this claim.  Defendant's arguments to the contrary, which do not address the unsanitary-workplace theory, are unavailing.  First, Defendant argues that the accusations of misconduct were not retaliatory because neither Garibyan nor Chen was aware that Plaintiff had requested an accommodation.  But neither "this nor any other circuit has held that, to satisfy the knowledge requirement [of a retaliation claim], anything more is necessary than general corporate knowledge that the plaintiff has engaged in a protected activity." *Gordon v. N.Y.C. Bd. of Educ.*, 232 F.3d 111, 116 (2d Cir. 2000) (retaliation under Title VII); *see also Wilson v. New York*, No. 15 Civ. 23, 2017 WL 9674497, at *14 (E.D.N.Y. Jan. 24, 2017), *report and recommendation adopted*, 2018 WL 1466770 (E.D.N.Y. Mar. 26, 2018) ("Under this standard, a plaintiff need not show that the individuals who allegedly retaliated against him had actual knowledge of his prior protected activity.  Rather, a plaintiff alleging retaliation need only show that any individual employee was aware of the activity in order to impute that knowledge

to the employer organization as a whole.").  Second, Defendant argues that the decision to investigate and meet with Plaintiff regarding the Galaxy System incident was made prior to any request for accommodation.  But Chen emailed Plaintiff about the meeting, at the earliest, on July 27, 2019, three days after Plaintiff's first request for accommodation.  Defendant identifies no record evidence that a decision was made beforehand.  Third, Defendant argues that "[r]eprimands and threats of disciplinary action, in the absence of other negative results do not constitute adverse actions in the context of a retaliation claim."  However, "[a] formal reprimand issued by an employer is not a 'petty slight,' 'minor annoyance,' or 'trivial' punishment; it can reduce an employee's likelihood of receiving future bonuses, raises, and promotions, and it may lead the employee to believe (correctly or not) that [her] job is in jeopardy.  A reasonable jury could conclude as much even when . . . the letter does not directly or immediately result in any loss of wages or benefits, and does not remain in the employment file permanently."  *Millea v. Metro-N. R. Co.*, 658 F.3d 154, 165 (2d Cir. 2011); *accord Bogden-Cozmuta v. Granby Urgent Care, LLC*, No. 20 Civ. 879, 2022 WL 4585442, at *7 (D. Conn. Sept. 29, 2022).  Fourth, Defendant argues that the later allegations of misconduct cannot be retaliatory "because they occurred three months or longer after Plaintiff requested an accommodation" on July 24, or August 6, 2019.  The argument fails because (1) Plaintiff continued to request accommodation after August 6, 2019 -- for example, on August 27 and September 4, 2019, in emails to Walton-Smalls, and on November 20, 2019, through Disability Rights New York, and (2) Altschul met with Plaintiff about the alleged leave-misconduct on November 8, 2019, i.e., months before a letter was placed in Plaintiff's file.  The intervening period is sufficiently short that the Court cannot, as a matter of law, determine the inferred causal relationship severed.  *See Burkybile*, 411 F.3d at 314.

Finally, Defendant argues that the retaliation claim must be dismissed because the only remedy Plaintiff seeks is an award of compensatory damages which, Defendant contends, are not recoverable for a retaliation claim under the ADA.  Although this remains an open issue in the Second Circuit, *see Pacheco v. Park S. Hotel, LLC*, No. 12 Civ. 9127, 2014 WL 292348, at *4 (S.D.N.Y. Jan. 27, 2014); *Terpening v. McGinty*, No. 21 Civ. 1215, 2022 WL 17418268, at *8 (N.D.N.Y. Oct. 5, 2022), *report and recommendation adopted*, 2022 WL 17415121 (N.D.N.Y. Dec. 5, 2022), in the employment discrimination context, the remedies available for violations of the ADA are generally considered coextensive with the remedies available under Title VII, which permits employees to recover compensatory and punitive damages, *see Richter v. JBFCS- Jewish Bd. of Fam. & Child. Servs.*, No. 18 Civ. 6959, 2019 WL 13277316, at *3 (E.D.N.Y. Mar. 14, 2019); *Edwards v. Brookhaven Sci. Assocs., LLC*, 390 F. Supp. 2d 225, 234 (E.D.N.Y. 2005) (explaining that "the Second Circuit, without analyzing the issue, has affirmed an award of compensatory damages in a retaliation case brought under the ADA[]").  Defendant's argument is therefore rejected.  Summary judgment on the retaliation claim is denied.

### D.    Hostile Work Environment Claim

Plaintiff asserts that Defendant created a hostile work environment.  Defendant's motion for summary judgment is denied with respect to the hostile work environment claim.

The Second Circuit has recognized "that hostile work environment claims are cognizable under the ADA," *Fox*, 918 F.3d at 69, and evaluates the claims under the Title VII hostile work environment framework, *id.* at 74 (quoting *Alfano v. Costello*, 294 F.3d 365, 373 (2d Cir. 2002)). To prevail on such a claim, Plaintiff must show "(1) that the harassment was sufficiently severe or pervasive to alter the conditions of [her] employment and create an abusive working environment, and (2) that a specific basis exists for imputing the objectionable conduct to the employer."  *Id.*

"Although the victim must subjectively perceive the conduct as abusive, the misconduct shown also must be severe or pervasive enough to create an objectively hostile or abusive work environment." *Id.*; *see Duplan v. City of New York*, 888 F.3d 612, 627 (2d Cir. 2018) (describing plaintiff's burden of producing enough evidence on a hostile work environment claim as a "high bar"). "Even an isolated act may be so serious that it requires the conclusion that the terms and conditions of employment were altered." *Fox*, 918 F.3d at 74. "A plaintiff alleging a hostile work environment claim under the ADA, therefore, must demonstrate either that a single incident was extraordinarily severe, or that a series of incidents were sufficiently continuous and concerted to have altered the conditions of her working environment." *Id.* "Courts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with [the plaintiff's] work performance." *Id.* "The question of whether a work environment is sufficiently hostile . . . is one of fact," and "summary judgment is appropriate only if it can be concluded as a matter of law that no rational juror could view the defendant's conduct as an intolerable alteration of the plaintiff's working conditions." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 75 (2d Cir. 2001); *accord Talbott-Serrano v. Iona Coll.*, No. 21 Civ. 1055, 2022 WL 3718346, at *16 (S.D.N.Y. Aug. 29, 2022).

Construing the record in the light most favorable to Plaintiff and drawing reasonable inferences in her favor, Plaintiff raises a genuine dispute of material fact as to her hostile work environment claim. This determination is made by looking to "the totality of the circumstances" and evaluating allegedly discriminatory incidents "cumulatively," rather than by asking whether any "incident of harassment 'standing alone' is sufficient to sustain [the] hostile work

environment claim." *Williams v. N.Y.C. Hous. Auth.*, 61 F.4th 55, 74 (2d Cir. 2023). Courts also may "analyz[e] each key event in isolation" to determine whether each one is "sufficiently severe" to sustain the claim on its own. *Id.*

The incidents and courses of conduct Plaintiff identifies, when taken together, are sufficient to support a jury finding in her favor. First, Plaintiff asserts that she endured a hostile work environment because Roman allowed a security alert to exist as if Plaintiff "was a criminal" that barred her from Tweed. As discussed above, the alert was "very visible" to employees walking by, remained in place for almost three months and caused Plaintiff to feel mortified, humiliated and distressed. Second, Plaintiff asserts that Defendant required her to work in a "dangerous" workplace. Plaintiff identifies a number of doctors' notes provided to the DOE in September and October 2019 that "expressed the severity of the situation." For example, Plaintiff's neurologist wrote on September 13, 2019, that Plaintiff "has been getting constant headache, nausea/vomiting and shortness of breath" and "had to be rushed to the hospital ER twice," and Plaintiff's pulmonologist wrote a letter dated September 19, 2019, that describes how Plaintiff "has suffered acute asthmatic attacks with transfer to a new office." Defendant provided Plaintiff with air purifiers but did not move Plaintiff out of Room 411 for almost seven months. A reasonable jury could find that Plaintiff subjectively perceived the above conduct as creating a hostile or abusive environment, and that such environment was created "because of" her disability, since the security alert was posted just hours after Plaintiff requested an accommodation and her requests to move offices bear relation to her medical condition.

A reasonable jury could also find the foregoing incidents "sufficiently severe or pervasive" enough to constitute an objectively hostile work environment, viewing those incidents

together and considering, among other things, "the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance." *See Fox*, 918 F.3d at 74. The alleged hostility went on for almost seven months, was both physically threatening and humiliating and, in fact, worsened Plaintiff's health. As Plaintiff suggests, a reasonable person could perceive "a work environment that threatens their very life to be so severe that it altered the terms and conditions of their employment." Summary judgment on the hostile work environment claim is therefore denied.

## IV. CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is granted in part and denied in part. For clarity, Defendant's motion is granted with respect to Plaintiff's ADA discrimination claim. Plaintiff's surviving claims are: ADA failure to accommodate, retaliation and hostile work environment.

Plaintiff's request for an oral argument is denied as moot.

The Clerk of Court is respectfully directed to close the motions at Dkt. Nos. 52 and 73.

Dated: July 24, 2023
New York, New York

LORNA G. SCHOFIELD
UNITED STATES DISTRICT JUDGE

29